496 So.2d 360 (1986)
William D. HUTSON, Jr., Plaintiff-Appellee-Appellant,
v.
MADISON PARISH POLICE JURY, Defendant-Appellee-Appellant.
Daniel E. MIZE, Plaintiff-Appellee-Appellant,
v.
MADISON PARISH POLICE JURY, Defendant-Appellee-Appellant.
Nos. 17909-CA, 17910-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1986.
Rehearing Denied September 18, 1986.
On Rehearing October 29, 1986.
Writ Denied December 19, 1986.
*361 C. Calvin Adams, Jr., Tallulah, James C. Crigler, Jr., Lake Providence, for William D. Hutson, Jr.
Sevier, Yerger & Bishop, by Thomas W. Bishop, Tallulah, for Daniel E. Mize.
William J. Guste, Atty. Gen., Baton Rouge, James David Caldwell, Dist. Atty., Tallulah, for defendant-appellee-appellant.
Before HALL, SEXTON and LINDSAY, JJ.
SEXTON, Judge.
This action arises as the result of a one car automobile accident which occurred on April 20, 1974 at a T-shaped intersection in rural Madison Parish. Both the driver, William D. Hutson, and the passenger, Daniel E. Mize, were seriously injured. As a consequence, each instituted an action against the Madison Parish Police Jury, which filed a third party demand against the State of Louisiana through the Department of Highways (DOTD). In turn, the DOTD third partied Walker and Wells, contractors, who performed contract work on behalf of the state at the intersection in question. Additionally, Daniel E. Mize named William D. Hutson as defendant, and Hutson reconvened against Mize for his failure to inform Hutson of the approaching intersection. Both the DOTD and Walker and Wells were dismissed from the suit on exceptions of prescription. The cases were consolidated and after a trial, judgment was rendered in favor of Hutson and Mize and against the Madison Parish Police Jury. However, each award was reduced by fifty percent due to the Madison Parish Police Jury's inability to adequately respond in damages. Hutson, Mize and the Madison Parish Police Jury have appealed. We reverse in part, amend and, as amended, affirm in part.

FACTS
The accident in question occurred at the intersection of Parish Roads E-8, the Stockland Road, which runs from east to west, and E-9, the Stockland Road North, which runs from north to south. The roads intersect in a T-shape, twenty-six degrees short of being perpendicular. The Stockland Road is the superior road.
The plaintiffs encountered this intersection as they traveled from Indianola, Mississippi to Tallulah, Louisiana. The driver apparently did not perceive the intersection in time to negotiate the required turn onto Stockland Road and the vehicle crashed into the ditch running parallel to that road. That the accident occurred at approximately 9:45 p.m. on Saturday, April 20, 1974 is undisputed. Additionally, as counsel for the police jury concedes in brief, the record evidence preponderates against the existence of a stop sign at the intersection at the time of the collision.
Most of the other salient facts concerning the length of time plaintiffs had been traveling, the number of stops they made, the amount of alcoholic beverages they had consumed, the speed at which they traveled, the existence of a culvert near the ditch, the length of skid marks, and whether *362 the vehicle became airborne upon leaving the roadway prior to the collision are facts which were seriously contested at trial. The testimony forming these disputes is more appropriately compared and contrasted below in the discussion of victim fault.

VICTIM FAULT
The defendant, Madison Parish Police Jury, strenuously argues that the trial court manifestly erred in its conclusion that the plaintiffs were not barred from recovery because of victim fault. The defendant argues that the excessive speed of the plaintiffs' vehicle and the intoxicated condition of plaintiff Hutson were the causes of the accident. Furthermore, although this argument is less than well defined, defendant argues that plaintiff Mize is barred by failing to keep a proper lookout and failing to warn the driver of the impending intersection, of which he was aware, in time to avoid the consequences. It is now axiomatic that in order to recover under a strict liability theory grounded in LSA-C.C. Art. 2317, the injured plaintiff must show that a defective aspect of the thing in defendant's custody posed an unreasonable risk of injury to others, and that his damage occurred through that risk. Loescher v. Parr, 324 So.2d 441 (La.1975); McCart v. Sears, Roebuck and Company, 460 So.2d 1104 (La.App. 2d Cir.1984), writ denied 462 So.2d 1265 (La.1985).
A public body can escape strict liability only by showing that the harm was caused by the fault of the victim, by fault of a third party, or by an irresistible force. Loescher v. Parr, supra; Tappel v. Vidros, 407 So.2d 789 (La.App. 4th Cir.1981).
Fault of the victim sufficient to preclude recovery is conduct of such a nature and to such an extent as to constitute a cause in fact of the accident. Hayes v. State Through the Department of Transportation and Development, 467 So.2d 604 (La.App. 3d Cir.1985), writ denied 475 So.2d 354 (La.1985).
In Hayes, the court noted the following with respect to the definition of cause in fact:
In Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962), cause-in-fact was explained as follows:
"Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm.... [T]he negligent conduct is undoubtedly a substantial factor in bringing about the collision if the collision would not have occurred without it. A cause-in-fact is a necessary antecedent. If the collision would have occurred irrespective of the negligence ... then his negligence was not a substantial factor or cause-in-fact...." (Footnotes omitted.)

In Ganey v. Beatty, 391 So.2d 545 (La.App. 3rd Cir.1980), writ denied, 396 So.2d 1325 (La.1981) we stated:
"To determine cause-in-fact, courts will carefully scrutinize all the evidence, and those acts will be adjudged causes-in-fact when it is found that more probably than not they were necessary ingredients of the accident. Stated otherwise, an act will be deemed a cause-in-fact of an accident only when, viewed in the light of all the evidence, it is concluded that it is a substantial factor without which the accident would not have happened." (Emphasis added.)

LSA-R.S. 32:235 makes a police jury or parish authority responsible for placing and maintaining traffic control devices upon highways under its jurisdiction. McCoy v. Franklin Parish Police Jury, 414 So.2d 1369 (La.App. 2d Cir.1982). Consequently, the parish road in this case was a thing under the care of the police jury. The unmarked "T" intersection constituted an unreasonable risk of harm to the motoring public.
Although it is unclear whether the basis of the trial court's finding of liability was grounded in LSA-C.C. Arts. 2315 or 2317, the facts clearly support plaintiffs' position *363 that the police jury is strictly liable unless they were barred by their own victim fault. As to plaintiffs Hutson and Mize, the pivotal issue then is whether their injuries resulted from the risk posed or from their own fault as victims.
According to plaintiff William D. Hutson's version of events, which basically harmonizes with plaintiff Daniel Mize's testimony, Hutson and Mize left Indianola at approximately 6:00 to 6:30 p.m. on the evening of the accident. Hutson related that the first stop the men made was at Sonny's Place, a lounge on the Alsatia Road. He stated that he and Mize were there only a matter of moments as they had only stopped there to look for Mize's wife so that she might take Mize home from that point, saving Hutson the additional trip. Both Hutson and Mize testified that they consumed no alcoholic beverages on the premises. Mize's wife was not at Sonny's Place; consequently, the men resumed their journey.
Hutson testified that as they traveled down Stockland Road North, he needed to relieve himself and was therefore looking for a place to stop. Hutson stated that the car was traveling 40-45 miles per hour before he slowed to 25 miles per hour as he searched for a private spot. They passed the residence of Lottie Westmoreland, and he noticed that there were people outside in the yard so he elected to proceed down the road out of their view before stopping. Hutson also remembers that he might have waved to the people as the car passed. Mize stated that he did not wave or speak. According to Hutson, he stopped the car further down the road for a period of time sufficient to urinate and then proceeded toward the intersection at a speed of 40-45 miles per hour. Hutson stated that just as he got "in" the intersection, Mize told him to turn. He cut his steering wheel to the left and applied the brakes. The car skidded down into the ditch and then slid to the east, hitting a culvert before coming to rest. Following the collision, Danny Mize was unconscious, but Hutson was alert and in pain.
Hutson testified that on the day of the accident, he bought a half-pint bottle of whiskey at about 1:00 o'clock p.m. Shortly thereafter, he mixed one drink out of the bottle with 7-up. He stated that he and Mize had another drink out of the bottle at approximately 5:00 to 5:30 p.m. and that they each had another drink at 6:00 to 6:30 p.m. Plaintiff Hutson stated that he may have had one other drink out of the half pint bottle prior to the accident.
Lottie Westmoreland testified that on the night of the accident, her daughters, Doris Westmoreland Glass and Delores Cole, her son-in-law, George Cole, and her daughter-in-law, Mary Westmoreland, were in her yard barbecuing while she remained inside. As she looked through her kitchen window which faced north, she saw the approaching car slow down and the occupants yell to her family in the yard. She stated that when the car slowed, it was traveling approximately 35 to 40 miles per hour. When Mrs. Westmoreland was recalled as a witness on rebuttal, she stated that she did not know the speed of the car. Counsel for plaintiffs were allowed over an objection by counsel for defendant to play the tape of Mrs. Westmoreland's deposition. On the tape the witness stated that the car was going slow and that she thought it would stop before it passed the house. She noted, however, that a time period of only a few seconds elapsed before the car crashed. She also noted that Doris and Mary who were in her yard had a better vantage point than she.
Mary Westmoreland, who was in the yard, heard the car going by at a high rate of speed. She observed two men hanging out of the window and yelling to the people in the yard. Mrs. Westmoreland stated that her sister-in-law, Doris, said, "They'll never be able to stop at the intersection," then ten or fifteen seconds later she heard the car crash. She stated that the time elapsed was seconds, and definitely less than one minute.
Doris Westmoreland Glass was also in the yard. Like her sister-in-law, Mary, she heard the car approaching and saw Danny *364 Mize and Billy Hutson, both of whom she knew, in the car. She stated that they were hollering, "Hey, baby," and that their voices seemed slurred. She testified that the car went by at a fairly high rate of speed and within five to six seconds she heard the car crash. Mrs. Glass stated that she could not have counted to ten before the car crashed. She said that she could observe the car as it passed the house and that the car made no stop before reaching the intersection. She remembered telling her sister-in-law that the car was going too fast for the driver to be able to turn at the intersection.
Ludie Westmoreland, Lottie's son, resides on the Stockland Road. Mr. Westmoreland heard the crash from his home and went to the scene. There he found Danny Mize unconscious and Billy Hutson holding his back stating that he thought it was broken. Westmoreland testified that he could smell whiskey everywhere and that he found a bottle in the car. Westmoreland said that Billy Hutson asked him to get rid of it, stating that he was in enough trouble. The witness said emphatically that the whiskey bottle was a pint sized bottle with, at the most, an inch of liquid left in the bottom. He also noted that the bottle had a cap on it. Ludie Westmoreland noticed skid marks at the scene of the accident which he said looked like the car slid sideways and went into the ditch.
Carlos Glass, who was at Lottie Westmoreland's house when the wreck occurred, went with George Cole to the scene of the accident. Although Glass testified that he could not say Billy Hutson was drunk, he testified that Hutson appeared to have been drinking. Glass testified that the odor of alcohol was so strong in the car that he assumed that the bottle had spilled. Mr. Glass stated that he was unsure what size the bottle of whiskey found in the car was; however, he heard William Hutson state, "Men, ya'll know the situation here. Would ya'll dispose of the evidence...." Thereafter, Ludie Westmoreland threw the bottle across a bean field. William Hutson categorically denied asking anyone at the scene to throw away the bottle. Glass also noticed that the skid marks left by the car covered approximately 100 to 150 feet.
Another witness, Gillis Acreman, testified that he heard about the accident and went to the site the morning after it occurred to satisfy his own curiosity. Acreman described the skid marks as short, like the vehicle was at the end of the road before the driver perceived that the road ended.
Both the ambulance driver and the emergency medical technician who worked the accident with the ambulance testified that the odor of alcohol was noticeable. Phillip Crothers, the ambulance driver, stated that he noted the smell of whiskey in the vehicle but was unsure whether he smelled it on the occupants of the car. Tressie Whitley, the E.M.T., stated that the odor of alcohol in the ambulance was "real strong" but that she could not tell from where it emanated. She also noted that Mize appeared to be snoring and that she could not tell whether he was unconscious, asleep, or in a coma.
Trooper Claude Mercer testified that he received the accident call at approximately 9:45 p.m. He testified that the road was dry and that there did not seem to be a stop sign in place. He noted that the vehicle struck the embankment at an angle, with the point of impact with the car being the right middle. He determined that the skid marks measured 127 feet from the south side of the Stockland Road. The skid marks began approximately at a point where a telephone pole stood. Considering the speed of the vehicle and the damage, the trooper estimated the speed of the vehicle at 65 miles per hour in a 55 mile per hour zone. The trooper also opined that the vehicle became airborne after leaving the roadway because he specifically remembered that the grass in the ditch was undisturbed and bore no evidence that the car had traveled through it. Additionally, the trooper recalled a strong smell of alcohol in the car and on the driver. He therefore ordered that blood be drawn for blood *365 alcohol tests at the hospital where the victims were taken.
The defendant offered the testimony of Ray Herd, supervisor of the Northwest Louisiana Criminalistics Laboratory Commission and self-employed as an accident reconstructionist, to rebut the testimony of plaintiffs. Herd investigated the scene of the accident on April 18, 1981 with the aid of Claude Mercer, the state trooper, and Ludie Westmoreland. He concluded that the vehicle did indeed become airborne and did not touch any part of the ditch before hitting the embankment on the other side. Extrapolating from the length of the skidmarks and the distance the car was airborne, Herd calculated that the vehicle was going 71 miles per hour when the driver reacted to the perceived danger. Herd testified further that if the driver had been driving 45 miles per hour and reacted at the same distance, the actual skidding distance would have been 103 feet, and the driver would have stopped 50 feet before the south edge of the roadway. He also calculated that if driven at 71 miles per hour, the vehicle would have crashed in 11.9 seconds after passing Lottie Westmoreland's residence. Additionally, Herd was asked to view the photographs of the damage sustained by the car and he remarked that the damage was consistent with the 71 mile per hour figure, and that he was in fact surprised at how much damage the accident caused to the vehicle.
Although the trial court sustained an objection to the admissibility of the results of blood alcohol tests, they were entered into evidence by stipulation at another point in the trial. The results revealed that at approximately 11:30 p.m. Hutson's blood alcohol level was .08, and Mize's was .10.
Jimmy Barnhill, an expert in the field of analysis of blood for alcoholic content, testified that the elimination rate for alcohol ranged from .015 to .025 grams percent per hour. He testified that if Hutson had consumed alcohol at the times and in the amounts he testified to, his blood alcohol level would be .0. Furthermore, this expert testified that if a person's blood alcohol level was .0, the only way his breath would have an alcoholic odor is if he rinsed his mouth out with an alcoholic beverage but did not swallow it.
The trial court weighed the conflicting testimony and resolved the dispute in favor of plaintiffs. In so doing, the court placed particular emphasis on the recorded testimony of Lottie Westmoreland, since that testimony was taken more closely in time to the accident than any other before the court. The court discounted Herd's testimony relative to the speed of the vehicle because it was based in part on the Trooper's measurements and recollections provided nearly seven years after the accident. Additionally, the court found that there was no evidence to indicate that plaintiff Hutson's admitted alcohol consumption on the day of the accident in any way affected his control of the vehicle.
The trial court found that the facts of this case bore a striking similarity to the facts of McCoy v. Franklin Parish Police Jury, supra. In that case, plaintiff encountered an unmarked "T" intersection, skidding across the road into a ditch and suffering injuries. The plaintiff in McCoy was generally unfamiliar with the thoroughfare, but was aware that she needed to turn right, although she did not know exactly where. She further acknowledged that she knew the road was going to end but was unsure at exactly what point. She was proceeding with her eyes on the road at a speed of 15 to 25 miles per hour on a dark, foggy night looking for some sign or indication of where to turn. Given those facts, the court concluded that she had no duty to anticipate that the "T" intersection that terminated in a ditch would be unmarked and devoid of any warning whatsoever. The court found that her conduct was in accord with that of a reasonably prudent person faced with similar conditions and circumstances. Consequently, the court found that the trial court clearly erred in finding that plaintiff driver was contributorily negligent.
We believe that the facts of the instant case make it clearly distinct from the situation *366 existing in McCoy as well as the other cases cited therein. Although the trial court relied heavily on the testimony of Lottie Westmoreland in order to conclude that the vehicle was proceeding at a slow rate of speed prior to the crash, this testimony also establishes that Mrs. Westmoreland could not see the car after it passed her house from her vantage point. Moreover, Mrs. Westmoreland admitted that her daughter and daughter-in-law, who were in the yard, could see more clearly than she. The testimony of these disinterested witnesses, who admittedly had a better opportunity to view the actions of plaintiffs prior to the crash, are corroborated by the expert extrapolation of speed from the physical evidence. Although the expert reconstructed the accident some seven years after it occurred, the preponderance of the evidence indicates that the vehicle was traveling at an excessive rate of speed.
Furthermore, the blood alcohol levels of plaintiffs Hutson and Mize indicate that they had consumed considerably more alcohol prior to the accident than they admitted at trial. This fact is given particular credence by the testimony of Ludie Westmoreland, whom plaintiff Hutson asked to get rid of the whiskey bottle for him, realizing its incriminating nature.
We are strengthened in our conclusion by the following case results. In Holmes v. State Through the Department of Highways, 466 So.2d 811 (La.App. 3d Cir.1985), writ denied 472 So.2d 31 (La.1985), the court concluded in an action grounded on LSA-C.C. Art. 2317 that the Highway Department's duty to maintain a safe shoulder does not encompass a foreseeable risk of injury to a motorist who strays completely off the traveled portion of the highway because his driving ability was impaired by reason of intoxication. The First Circuit in Efferson v. State Through the Department of Transportation and Development, 463 So.2d 1342 (La.App. 1st Cir.1984), writ denied 465 So.2d 722 (La.1985), held that a motorist who had been drinking earlier on the evening of an accident and who encountered a curb at an excessive rate of speed was contributorily negligent and, thus, the DOTD's responsibility under Art. 2317 for a defective road shoulder was not the sole cause of the accident. Likewise, in Kennison v. State Through the Department of Transportation and Development, 486 So.2d 267 (La.App. 3d Cir.1986), the state's failure to warn an intoxicated motorist traveling at an excessive rate of speed around a curve of which he had prior knowledge, was not the cause in fact of the plaintiff's harm, but, rather, the motorist's fault was the sole cause of the collision. In Hayes, supra, the court concluded that plaintiff's conduct substantially contributed to her single vehicular accident, in that the driver was driving 40 m.p.h. on a curb with a posted advisory speed limit of 20 m.p.h. and was additionally straddling the center line.
While we are cognizant of the principle that factual findings of the trial judge will not be disturbed in the absence of evidence of manifest error, we are not required by the manifest error principle to affirm a trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively corroborated testimony where the record indicates that there was no sound reason for the rejection and where the finding was reached by overlooking applicable legal principles. McCoy v. Franklin Parish Police Jury, supra. See also Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), and West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979).
Consequently, we have little difficulty in concluding that the totality of evidence considered, Hutson's injuries were caused by his operation of the vehicle in an intoxicated condition at an excessive rate of speed. Stated differently, the police jury's duty to post warning signs at this intersection did not encompass the risk of injury to an intoxicated defendant traveling at an excessive rate of speed. Therefore, Hutson's conduct was a cause-in-fact of the accident *367 amounting to victim fault thus operating to preclude Hutson's recovery.[1]
While the police jury has not assigned the question of plaintiff Mize's fault as error, we treat that fault because the brief can arguably be said to present that issue.
The law with respect to the contributory negligence of a guest passenger was accurately summarized in McCoy v. Franklin Parish Police Jury, supra, as follows:

White v. State Farm Mut. Auto. Ins. Co., 222 La. 994, 64 So.2d 245 (1953), sets forth the often quoted rule regarding contributory negligence of a guest passenger:
Contributory negligence is, as the phrase signifies, negligence which contributes to the accident, that is, negligence having causal connection with it and but for which the accident would not have occurred. Insofar as the rights of a guest in an automobile are concerned, it is settled that, in actions against third persons, the negligence of the host driver does not bar recovery because his negligence cannot be imputed to the guest. Lawrason v. Richard, 172 La. 696, 135 So. 29 [1931]; Lorance v. Smith, 173 La. 883, 138 So. 871 [1931]. (Footnote omitted.) However, a guest may be denied recovery on the ground of contributory negligence in instances where he is guilty on his own part of independent negligence of such a nature, that, but for which, his injuries would not have been sustained. Lorance v. Smith, supra; Churchill v. Texas & Pac. Ry. Co., 151 La. 726, 92 So. 314 [1922]; Delaune v. Breaux, 174 La. 43, 139 So. 753 [1932]; Squyres v. Baldwin, 191 La. 249, 185 So. 14 [1938]. But in determining whether the asserted fault of a guest has been a contributing factor in bringing about his injuries, it is first necessary to ascertain what duties are imposed upon him as pertain to the operation of the vehicle and the safety of the journey. It is firmly established by the above cited authorities of this Court and others of the Courts of Appeal of this State, too numerous to mention, that a guest is under no duty to supervise the driving of the vehicle and he is not obliged to look out for sudden or unexpected dangers that may arise. Albeit, he has the right to place reliance upon the driver to discharge that obligation and, as aptly expressed by the Court of Appeal, Second Circuit, in Singley v. Thomas, 49 So.2d 465, 469 [La.App.1950], "* * * is not required to monitor the operation or to pay attention to the road and other traffic conditions" in the absence of a showing that he has actual or constructive knowledge that the driver is incompetent or unfit to operate the vehicle.
On the other hand, the jurisprudence has imposed upon the guest an obligation to avoid an accident or injury to himself under certain conditions. That duty has been tersely said by this Court, in Delaune v. Breaux, supra, to exist in cases where the guest "* * * is aware of the fact that there is danger ahead, which apparently is unknown to the driver or may be unknown to him, or where a sudden or unexpected danger arises to the knowledge of the guest, apparently not observed by the driver * * *." 174 La. at page 47, 139 So. at page 755. In such situations, it is incumbent on the guest to warn the driver of the danger and, if he fails to do so at a time when the driver is able to avert it, his dereliction may be said to be a contributing cause of any injury he may sustain. 64 So.2d 249, 250.
[footnote omitted]
The evidence established that Daniel Mize had lived in the vicinity of the intersection previously for a period of years prior to the incident. While he may have been aware of the impending intersection, *368 we conclude that the evidence does not establish that he had a duty to watch for a sudden and unexpected danger such as the unmarked intersection. The evidence was conflicting as to whether the intersection had been marked with a stop sign in the past. Had the intersection been previously marked, Danny Mize may have been relying on the driver's perception of that stop sign in order to warn the driver of the impending danger. Thus, the facts simply do not bear out that plaintiff Mize was guilty of victim fault in failing to alert the driver.

DENIAL OF NEW TRIAL
Defendant Madison Parish Police Jury asserts that the trial court erred in failing to grant a motion for new trial based on newly discovered evidence, and in failing to allow a proffer of testimony relative to that claim. In brief, counsel for the police jury states that the trial court refused to allow the police jury to call a witness to the stand, Jimmy Ezell, whose testimony it claimed was necessary to corroborate another witness's testimony that both plaintiffs were in Sonny's Place at Alsatia, Louisiana, not only for five minutes the night of the accident, but actually for several hours, and that Ezell's companion, Sonny Powers, bought Danny Mize drinks while he was there, and sat down at the table with him.
A new trial based on newly discovered evidence must be granted where (1) such evidence is not merely cumulative, (2) it would tend to change the results of the case; and (3) it could not, with due diligence, have been obtained before or during trial. Thomas v. Smith, 463 So.2d 971 (La.App. 3d Cir.1985); Chauvin v. Chauvin, 297 So.2d 234 (La.App. 3d Cir.1974).
Moreover, a new trial may not be granted for newly discovered evidence which is not material to issues of the case and only has a tendency to discredit or impeach a witness. Young v. Clement, 359 So.2d 1070 (La.App. 3d Cir.1978), writ granted, 362 So.2d 798 (La.1978), affirmed in part and reversed in part on other grounds, 367 So.2d 828 (La.1979).
Here, the evidence was clearly targeted at the credibility of plaintiffs generally, and specifically as to the length of time they spent in Sonny's Place and whether they consumed any alcohol there. That they remained in the lounge for a longer period of time than that testified to would clearly be impeachment as to a collateral matter. Furthermore, any testimony relating to their alcohol consumption would tend to be cumulative considering the introduction of the blood alcohol test results and the testimony of witnesses at the scene. Consequently, the trial court did not err in denying a new trial.

DAMAGES
Having concluded that victim fault barred plaintiff Hutson's claim, it is unnecessary that we address the sufficiency of his damages.
The police jury perfunctorily challenges the amount of future lost wages awarded plaintiff Mize. Of the $116,000 awarded Mize for lost wages, only $44,000 was allowed for future lost wages based on the trial court's determination that Mize failed to show consistent remunerative employment before the accident. The trial court thus allowed $4,000 per year for a remaining work expectancy term of eleven years. We find no error in the award of this minimal sum.
Plaintiff Mize does not take issue with the amount of damages awarded by the trial court but claims that the trial court incorrectly applied the "inability to pay" rule, reducing his damages by fifty percent.
After trial and while this case was under advisement, the Supreme Court handed down the decision of Rodriguez v. Traylor, 468 So.2d 1186 (La.1985), which abolished the long standing jurisprudential defense of a defendant's inpecunious condition. In so doing, the court stated:
While we are hesitant to overrule a longstanding jurisprudential rule, after careful *369 consideration, we feel that the wealth or poverty of a party to a lawsuit is not a proper consideration in the determination of compensatory damages. Each litigant should stand equal in the eyes of the law regardless of his financial standing. When the inability to pay rule originated in this State there were no bankruptcy laws in effect and a defendant was subject to losing virtually everything he owned. While the policy behind the inability to pay rule, to prevent the bankruptcy of a defendant, is still a valid concern, with todays modern bankruptcy courts and extensive protections to defendants by virtue of the bankruptcy laws, we feel that this is a more proper consideration for bankruptcy courts and experienced bankruptcy judges rather than a jury which has no expertise in the modern day protections for those who are forced to declare bankruptcy. See La.R.S. 13:3881. We therefore conclude that the trial court should not have permitted the jury to hear evidence of the defendant's inability to pay.
In the case sub judice, the trial court was not unmindful of the Rodriguez v. Traylor decision but elected not to give its holding retroactive effect.
Generally, unless a decision specifies otherwise, it is to be given prospective and retrospective effect. Succession of Clivens, 426 So.2d 585 (La.1983) on rehearing. Rodriguez v. Traylor, supra, has specifically been given retroactive effect in Friday v. Mutz, 483 So.2d 1269 (La.App. 4th Cir.1986), and Marshall v. Beno Truck Equipment, Inc., 481 So.2d 1022 (La.App. 1st Cir.1985) on rehearing, writ denied, 482 So.2d 620 (La.1986).
The trial court clearly erred in failing to apply Rodriguez. Therefore, the portion of the award reducing plaintiff Mize's recovery by fifty percent because of the police jury's inability to pay must be vacated to award the full sum as assessed by the trial court.[2]
For the reasons expressed herein, the judgment of the trial court is reversed insofar as it allows plaintiff Hutson to recover from defendant, Madison Parish Police Jury. The judgment of the trial court is amended to delete the provision reducing plaintiff Mize's award by fifty percent (50%) due to the police jury's inability to pay the judgment. In all other respects, the judgment of the trial court is affirmed. All costs of this appeal are assessed equally between plaintiff Mize and defendant insofar as such costs are appropriate.
REVERSED IN PART, AMENDED and, AS AMENDED, AFFIRMED IN PART.
Before HALL, MARVIN, FRED W. JONES, Jr., SEXTON and LINDSAY, JJ.

ON REHEARING
PER CURIAM.
We find that the rehearing applications of the plaintiff, Hutson, and the defendant, Madison Parish Police Jury, are without merit.
However, we determine that we should address plaintiff Hutson's contention that we relied on blood alcohol results which the trial court excluded from evidence to find that the plaintiff Hutson was intoxicated and thus negligent.
The record is confusing on this issue. A complicating feature is that the defendant police jury's brief complained of this ruling obliquely rather than directly. Nevertheless, upon reconsideration, we determine that plaintiff Hutson is correct that in the final analysis the trial court rejected the blood alcohol result at issue.
We have no doubt that the trial court erred in this regard. The trooper testified *370 that he specifically ordered blood alcohol samples to be drawn. The lab technician identified her lab records and testified that these records showed that she drew blood from this plaintiff shortly after the accident. While there was some minor confusion at the coroner's office over the labeling of the blood samples, a comparison of the testimony of the coroner's secretary with the state police lab records shows that it is clearly more likely than not that the blood samples the lab reported on were those drawn from these plaintiffs.
More importantly, however, we note that the blood alcohol level of plaintiff Hutson was only one of the factors which caused us to conclude he was operating his vehicle in a negligent manner. There is extensive other evidence indicating his intoxication as we detailed in the original opinion, as well as significant evidence showing his excessive speed.
We regret the error but determine upon a reconsideration of the pertinent evidence that our original result is correct.
NOTES
[1] Of course, the facts of this cause preceded the inception of the doctrine of comparative negligence in Louisiana. See LSA-C.C. Art. 2323 as amended by Acts 1979, No. 431 § 1, effective August 1, 1980.
[2] Defendant also complains that the trial court erred in granting a dismissal of the State of Louisiana, through the Department of Highways on an exception of prescription. The minutes and reasons for judgment indicate that an exception of no cause of action was maintained on behalf of the state. However, no signed judgment appears in the record. Since there is no signed final judgment, this claim is not in a proper posture for review. See generally Hughes v. Hughes, 448 So.2d 263 (La.App. 2d Cir.1984), which holds that an appeal before a signed final judgment is premature and must be dismissed.